Plaintiff notes the VEERP Letter said nothing indicating that to be eligible for VEERP benefits, a Plan Participant had to be an "active", salaried employee during the Window Period. The language in the VEERP Letter most favorable to plaintiff's position, however, merely states, "if you are . . . an attending physician who participates in the retirement Plan and you have attained age 55 and completed 5 years of service with the Hospital on or before November 30, 1995, you are eligible to [*36] elect to retire under the VEERP." VEERP Letter at 1 (emphasis added). Plaintiff argues that because he was over 55, had worked at the Hospital for more than five years, and continued to be an attending physician at the Hospital in 1995, under the VEERP Letter's description of eligibility, he should have received VEERP benefits. Plaintiff seems to understand "eligible" to mean "entitled".

HN27 Under ERISA, pension plan administrators are given broad latitude in making benefit determinations, which are to be based on their reasonable understanding of the plan documents. Nothing in the record suggests that the Administrator's decision to deny plaintiff's claim was based on anything besides such an understanding. Yet, even if the Administrator were to have relied only on the "terms" of the VEERP Letter in deciding plaintiff's claim, the Administrator was not required to interpret the Letter's isolated statement that attending physicians such as plaintiff were "eligible" to participate in the VEERP to mean they were "automatically entitled" to do so. This is especially true given that the VEERP Letter also clearly indicated that the purpose of the VEERP was to reduce payroll by inducing salaried [*37] employees to retire early. In any event, were the Court to deem plaintiff's interpretation reasonable, defendants would still be entitled to summary judgment on his § 502(a)(1)(B) claim because "where it is necessary for a reviewing court to choose between two competing yet reasonable interpretations of a pension plan, this Court must accept that offered by the administrators." Pagan, 52 F.3d at 443; see also Jordan, 46 F.3d at 1273 ("Even if [plaintiff's] interpretation were as reasonable as the interpretation adopted by the . . . [plan administrator] . . . the arbitrary and capricious standard would require us to defer to the interpretation of the . . . [administrator]."). Summary judgment is accordingly granted to defendants on plaintiff's claim to recover benefits under ERISA § 502(a)(1)(B). n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 Plaintiff also argues, in conclusory fashion, that the VEERP Letter was itself an SPD, the terms of which he asserts conflict with the terms of the Plan. Because of this supposed conflict, plaintiff claims the Second Circuit's decision in Heidgerd, 906 F.2d at 907, mandates that the "terms" of the VEERP Letter control, and that he is therefore entitled to receive VEERP benefits. The VEERP Letter, however, is not an SPD. It does not contain much of the information that ERISA and its governing regulations require SPDs provide to benefit plan participants. See ERISA § 102(b), 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102-3 (1999). The three-page VEERP Letter differs markedly from the actual, comprehensive SPD the Hospital provided to Pension Plan participants. Regardless, the question of whether the VEERP Letter constitutes an SPD is not material because, as just described, there was no conflict between the VEERP Letter and the Plan. Had the administrator relied solely on the VEERP Letter in making his determination, it still would have been reasonable for him to deny plaintiff's claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*38]

**B. Wrongful Discharge Claim Under ERISA § 510**

HN28 Section 510 of ERISA provides that "it shall be unlawful for any person to discharge . . . a participant or beneficiary [of an employee benefit plan] . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . ." 29 U.S.C. § 1140. Construed liberally, plaintiff's third cause of action states a claim against each defendant that he was unlawfully discharged in order to prevent him from collecting the VEERP benefits. Defendants move for summary judgment on these claims.

The Second Circuit has held that HN29 wrongful discharge claims under ERISA are subject to the same burden-shifting analysis courts apply to employment discrimination claims. See Dister, 859 F.2d at 1112. Under that analysis, originally set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), plaintiff must first make a prima facie showing that the circumstances surrounding the non-renewal of his employment contract give rise to an inference of

discrimination. See id. at 802. If the plaintiff satisfies **[\*39]** that threshold burden, then the burden of production shifts to defendant to proffer a legitimate, non-discriminatory reason for not renewing plaintiff's contract. See id. If the defendant successfully proffers such a reason, then the burden of persuasion shifts back to the plaintiff to persuade the factfinder that the employer's explanation is but a pretext for discrimination. See id. at 803-04. The Second Circuit has noted that <sup>HN30</sup> § 510 provides no cause of action where the loss of pension benefits "'was a mere consequence of, but not a motivating factor behind, a termination of employment.'" Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (quoting Dister, 859 F.2d at 1111).

<sup>HN31</sup> To satisfy the first prong of the McDonnell Douglas test, plaintiff must make a prima facie showing that he (i) is a member of a protected group; (ii) was qualified for the position; and (iii) was discharged or denied employment under circumstances giving rise to an inference of discrimination. See Dister, 859 F.2d at 1114-15. While plaintiff's burden at this stage of the analysis is de minimis, see id. at 1114, his opposition papers all but ignore the wrongful **[\*40]** discharge claims made in his Amended Complaint. He does not mention the McDonnell Douglas test, and has not attempted to lay out the facts as he sees them in light of that legal touchstone.

As to the first element of the initial prima facie showing, plaintiff is in a protected group: pension plan participants. With respect to the second element, there is sufficient evidence that plaintiff was qualified for the position he held at the Hospital, despite the misgivings of Dr. Gold about his performance. The third element of the prima facie showing--that the discharge gives rise to an inference of discrimination--is the stumbling block for plaintiff. As discussed at length above, plaintiff was first given notice of termination by mid-1994, and officially ceased to be a paid member of the medical staff on December 31, 1994. The Hospital first deliberated the VEERP amendment in May or June of 1995, and adopted it in September of that year. Plaintiff has neglected to call the Court's attention to any evidence that might connect plaintiff's discharge with the promulgation of the VEERP. Plaintiff's only remarks in his opposition papers addressing his § 510 claim appear in his **[\*41]** version of a Rule 56.1 Statement, wherein he contends that Dr. Gold "had full knowledge of plaintiff's pension rights and his actions were deliberate and maliciously designed to prejudice those rights." Opp'n at 2-3. This isolated, unsubstantiated statement does not in any way connect plaintiff's discharge to the VEERP. Plaintiff notes in vague terms that Dr. Gold was aware of plaintiff's pension benefits, but says nothing about Dr. Gold's knowledge of the VEERP. In fact, when plaintiff was asked in a deposition whether Dr. Gold had terminated him with the intention of depriving him of pension benefits, he responded, "I cannot think of any other reason that he would do it," and then conceded, "I don't have any other basis [for thinking so]." Yoran Depo. at 57. It is apparent that the denial of VEERP benefits here was a "mere consequence of, but not a motivating factor behind, a termination of employment." Lightfoot, 110 F.3d at 906. Plaintiff has not put forth any evidence to suggest otherwise. Because there is nothing before the Court that could raise an inference that the Hospital terminated plaintiff in order to avoid offering him VEERP benefits, summary judgment must be given **[\*42]** to defendants on plaintiff's § 510 claims. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Even if plaintiff could survive the first prong of the McDonnell Douglas test, summary judgment would nonetheless be appropriate on the third prong. Defendants have substantiated their claim that plaintiff was not rehired because of his poor performance--satisfying the second prong of the McDonnell Douglas test. Plaintiff's unsupported counterstatement cannot convince a reasonable trier of fact that this explanation was a mere pretext for the unlawful purpose of interfering with his pension rights, given that the VEERP was not conceived until well after he was terminated. Thus, under either the first or third prongs of the McDonnell Douglas analysis, the absence of any connection between plaintiff's termination and the Hospital's decision to offer the VEERP entitles defendants to summary judgment on his wrongful discharge claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED and the action is

dismissed. **[*43]** Plaintiff's request for attorney's fees incurred in preparing opposition papers to this motion is hereby DENIED.

**SO ORDERED.**

New York, New York
June 10, 1999

Peter K. Leisure

U.S.D.J.

Service: **Get by LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 8679**
View: Full
Date/Time: Friday, October 21, 2005 - 10:28 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document Case 3:03-cv-00383-WIG   Document 249-5   Filed 10/21/2005   Page 4 of 11   Page 1 of 7

Service: **Get by LEXSEE®**
Citation: **1998 Conn. Super. LEXIS 620**

*1998 Conn. Super. LEXIS 620, \**

Paula Linda Reed v. Peter Zizka et al.

CV 950555221S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD-NEW BRITAIN, AT HARTFORD

1998 Conn. Super. LEXIS 620

March 5, 1998, Decided
March 5, 1998, Filed

**NOTICE:** [\*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Motion to Strike the Sixth Count granted. Motion to Strike the Seventh and Ninth Counts denied. Motion to Strike the Eighth Count granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, diocese, church, and priest, filed a motion to strike numerous counts in plaintiff victim's complaint after she was allegedly sexually assaulted by the priest when she was a minor. Defendants raised numerous defenses in their assertions that the counts should be stricken.

**OVERVIEW:** The victim alleged that a priest sexually assaulted her for approximately four years when she was a minor. The victim filed an action against defendants. defendants filed a motion to strike several counts of the complaint. The court granted the motion to strike the count asserting that the priest was acting under the control of the diocese when he engaged in the sexual conduct while acting the course and scope of his duties. The court held that, in applying the doctrine of apparent authority, the victim had to plead and prove that the diocese led the victim to a good faith belief that the priest was authorized by the diocese to engage in sexual conduct with her. In denying the motion to strike the counts regarding lack of supervision of the priest, the court held that the Free Exercise Clause of the United States Constitution did not prevent the court from determining whether the diocese was liable for negligently allowed its employees to engage in criminal conduct. The court granted the motion to strike the claim under the Connecticut Unfair Trade Practices Act, 42-110a et seq., as the act was intended to redress wrongs that occurred in the context of business and commerce.

**OUTCOME:** The court granted defendants' motion to strike the victim's count in the complaint that asserted that the priest was acting under the control of the diocese when he engaged in the sexual conduct while acting the course and scope of his duties. The court denied the motion to strike the counts that the diocese failed to properly supervise the priest. The court granted the motion to strike the count regarding unfair trade practices.

**CORE TERMS:** church, priest, counseling, commerce, religious, sexual, apparent authority, servant, oblate, unfair, rectory, doctrine of respondeat superior, summary judgment, matter of law, abandonment, religion, van, motion to strike, sexual relationship, exploitation, First Amendment, free exercise of religion, common law doctrine, scope of employment, knowingly permitted, vicariously liable, religious belief, sexual activity, general law, common law

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Strike

The function of a motion to strike is to test the legal sufficiency of a pleading. In deciding a motion

HN1± to strike the trial court must consider as true the factual allegations but not the legal conclusions set forth in the complaint. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
HN2± Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business. But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
HN3± While a servant may be acting within the scope of his employment when his conduct is negligent, disobedient and unfaithful; that does not end the inquiry. Rather, the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business. Unless the employee is actuated at least in part by a purpose to serve a principal, the principal is not liable. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
HN4± Whether the employee was acting within the scope of his authority is often a question of fact. However, where the alleged acts of the employee are very clearly outside of the scope of his authority, the courts of Connecticut consider the issue to be one of law. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
Criminal Law & Procedure > Criminal Offenses > Sex Crimes > Sexual Assault
HN5± Connecticut courts hold, as a matter of law, that when the tortfeasor-employee's activity with the alleged victim became sexual, the employee abandoned and ceased to further the employer's business. The laws and standards of the Roman Catholic Church expressly prohibit priests from engaging in any sexual activity of any kind. Thus, even if a priest engaged in sexually abusive conduct, he did so only after abandoning the church's tenets and his personal commitment to celibacy. Sexually abusive conduct amounts to the abandonment of the church's business. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
HN6± A principal may be held liable for an obligation incurred by an agent even if the principal has not expressly authorized the agent to incur the obligation if the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority. More Like This Headnote

Torts > Vicarious Liability > Respondeat Superior
Business & Corporate Entities > Agency > Authority to Act > Apparent Authority
HN7± Apparent authority must be derived not from the acts of the agent but from the acts of his principal. The acts of the principal must be such that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority. More Like This Headnote

Constitutional Law > Fundamental Freedoms > Freedom of Religion > Free Exercise of Religion
HN8± The Free Exercise Clause of the United State Constitution does not relieve an individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not discriminate against a religious belief or regulate or prohibit conduct because it is undertaken for religious reasons. More Like This Headnote | Shepardize: Restrict By Headnote

Torts > Business & Employment Torts > Unfair Business Practices
HN9± Conn. Gen. Stat. Ann. § 42-110b(a) states that no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Trade or commerce, in turn, is defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. Conn. Gen. Stat. Ann. § 42-110a(4). In determining whether conduct constitutes an unfair trade practice the Connecticut courts adopt the criteria set out in the "cigarette rule" by the federal trade commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers, competitors, or other businessmen. More Like This Headnote

**JUDGES:** Aurigemma, J.

**OPINIONBY:** Aurigemma

**OPINION:** MEMORANDUM OF DECISION ON MOTION TO STRIKE

The defendants, Hartford Roman Catholic Diocesan Corporation ("Diocese") and Church of the Holy Spirit ("Church"), have moved to strike the Sixth through Ninth Counts of the plaintiff's complaint in this action in which the plaintiff seeks damages from those defendants and the defendant, Peter Zizka, as a result of Zizka's alleged sexual exploitation of the plaintiff when she was 13 years old. The moving defendants assert that the plaintiff has failed to set forth a cause of action against them based on respondeat superior (Sixth Count), that the Connecticut Unfair Trade Practices Act, 42-110a et seq. ("CUTPA") does not apply here because the defendants were not engaged in trade or commerce (Eighth Count), and that the court's consideration of the allegations of the defendants' negligence is an impermissible **[*2]** intrusion into religious affairs in violation of the United States Constitution (Seventh and Ninth Counts).

Facts alleged in the complaint

The complaint alleges that commencing in the summer of 1975 when the plaintiff was 13 years of age, she received counseling from Peter Zizka, a Roman Catholic priest, who was then employed by the Diocese and assigned as a priest at the Church. Count One 2-4. In July or August 1975 while counseling the plaintiff in his rectory office at the Church, Zizka sexually abused the plaintiff by kissing and fondling her. Count One 5. Such acts continued until on or about November 13, 1975 at which time Zizka had sexual intercourse with the plaintiff in his rectory office. Count One 6-7. Zizka's sexual relationship with the plaintiff continued until approximately August or September 1979. Count One 10.

The complaint further alleges that Zizka was authorized by the Diocese to interact with parishioners of the Church and provide counseling services and at all times Zizka was under the direct supervision and control of the Diocese and engaged in the conduct alleged while acting in the course and scope of his duties as a priest. Count Six 10-11. Seventh **[*3]** Count 10. In approximately 1977 the Diocese was informed that Zizka had been involved inappropriately with a minor female and failed to dismiss him, failed to notify the Church of said information. Seventh Count 12. The Seventh Count further alleges that the Diocese negligently hired Zizka, and failed to use reasonable care in supervising and training him, failed to establish a policy for reporting and pursuing members of the clergy who engaged in sexual misconduct with minors, and failed to warn the plaintiff and her family that Zizka was a danger to minor females. *Id*.

The Eighth Count alleges that the Diocese is engaged in the commerce or trade of offering and selling the service of religious sacraments. The decision to retain Zizka was made in the course of the trade and business of the Diocese. That decision by the Diocese constitutes an unfair and deceptive act and practice. 12-13. The Ninth Count alleges that the Church was negligent in that it should have realized that Zizka was spending an inordinate amount of time with the plaintiff in the rectory and outside the rectory on church grounds, which should have prompted further inquiry into the relationship between the **[*4]** two and in that it failed to warn the plaintiff and provide notification to her parents that Zizka was spending an inordinate amount of time with their teenage daughter. 11.

Discussion of the Law and Ruling

HN1 The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book 152; *Ferryman v. Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989); *Mingachos v. CBS, Inc.*, 196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. *Liljedahl Bros., Inc. v. Grigsby*, 215 Conn. 345, 348, 576 A.2d 149 (1990); *Blancato v. Feldspar Corp.*, 203 Conn. 34, 36, 522 A.2d 1235 (1987).

HN2 Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business. *Cardona v. Valentin*, 160 Conn. 18, 22, 273 A.2d 697 (1970); *Antinozzi v. A. Vincent Pepe Co.*, 117 Conn. 11, 13, 166 A. 392 (1933); *Son v. Hartford Ice Cream Co.*, 102 Conn. 696, 699, 129 A. 778 (1925) *Larsen Chelsey Realty Co. v. Larsen*, [*5] 232 Conn. 480, 500, 656 A.2d 1009 (1995). But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply. *Mitchell v. Resto*, 157 Conn. 258, 262, 253 A.2d 25 (1968); *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 208, 579 A.2d 69.

HN3 "While a servant may be acting within the scope of his employment when his conduct is 'negligent, disobedient and unfaithful'; *Butler v. Hyperion Theater Co.*, 100 Conn. 551, 554, 124 A. 220 (1924), quoting *Loomis v. Hollister*, 75 Conn. 718, 723, 55 A. 561 (1903); that does not end the inquiry. Rather, 'the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business . . .' *Butler v. Hyperion Theatre Co.*, supra, 556." *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 210, 579 A.2d 69. Unless the employee is actuated at least in part " 'by a purpose to serve a principal, the principal is not liable.' *Meyers v. National Detective Agency, Inc.*, 281 A.2d 435, 437 [*6] (D.C.C.A. 1971), quoting *M.J. Uline Co. v. Cashdan*, 84 U.S. App. D.C. 58, 59, 171 F.2d 132, 133 (1948)." *International Distributing Corporation v. American District Telegraph Co.*, 186 U.S. App. D.C. 305, 569 F.2d 136, 139 (D.C. Cir. 1977).

HN4 Whether the employee was acting within the scope of his authority is often a question of fact. However, where the alleged acts of the employee are very clearly outside of the scope of his authority, the Courts of this state have considered the issue to be one of law. *Brown v. Housing Authority*, 23 Conn. App. 624, 628, 583 A.2d 643 (1990). In *Brown* the plaintiff and Sam Jones, a maintenance mechanic employed by the defendant, were involved in an altercation which began when the plaintiff asked Jones, who was driving a van owned by the defendant, to move his vehicle, which was blocking traffic. The two men exchanged words. When Jones refused to move the van, the plaintiff drove around it. Jones followed the plaintiff in the van, rear-ending the plaintiff's car several times. The plaintiff stopped his car and got out to speak with Jones. Jones also exited his vehicle, grabbed a hammer, chased the plaintiff around the car and struck [*7] him on the chest with the hammer, seriously injuring the plaintiff. In affirming a summary judgment in favor of the defendant employer, the Court said:

> It is clear in the present case that Jones was not furthering the defendant's business interests when he assaulted the plaintiff. His intentional, criminal acts were in no way connected to the defendant's business. The mere fact that Jones was driving from one job site to another when the assault took place does not change this analysis. " 'In the course of his employment' means while engaged in the service of the master, and it is not synonymous with the phrase 'during the period covered by his employment.' " *Levitz v. Jewish Home for the Aged, Inc.*, 156 Conn. 193, 198, 239 A.2d 490 (1968). As there were no facts before the court from which it could conclude that Jones was furthering the defendant's interests, the defendant's nonliability under the theory of respondeat superior was properly determined as a matter of law.

23 Conn. App. at 628.

HN5 Courts of this state have held as a matter of law that when the tortfeasor-employee's activity with the

alleged victim became sexual, the employee abandoned and ceased **[*8]** to further the employer's business. *Gutierrez v. Thorne*, 13 Conn. App. 493, 537 A.2d 527 (1988); *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66 (D. Conn. 1995); *Maule v. Sullivan*, 1993 Conn. Super. LEXIS 1994, 9 CONN. L. RPTR. 542, Hartford/New Britain J.D. at Hartford, No. CV-92-0517623S (Wagner, J.).

In *Nutt* the court stated:

> The laws and standards of the Roman Catholic Church expressly prohibit priests from engaging in any sexual activity of any kind. Thus, even if [priest] engaged in sexually abusive conduct, he did so only after abandoning the church's tenets and his personal commitment to celibacy. Sexually abusive conduct amounts to the abandonment of the Church's business. As a matter of law, therefore, the alleged sexual abuse, even if true, cannot be said to further the defendants' business and, therefore, is outside of the scope of employment.

921 F. Supp. at 71.

At oral argument the plaintiff cited the case of *Mullen v. Horton*, 46 Conn. App. 759, 700 A.2d 1377 (1997), in which Horton, who was a priest as well as a psychologist, provided the plaintiff with a combination of pastoral, spiritual and psychological counseling **[*9]** while employed by the defendant Missionary Oblates of Mary Immaculate, Inc. After the counseling commenced Horton and the plaintiff began a sexual relationship, with sexual contact taking place during the counseling sessions. The plaintiff sued the Missionary Oblates and the Franco-American Oblate Fathers, Inc., claiming that they were vicariously liable for Horton's action under the doctrine of respondeat superior and the doctrine of apparent authority.

The trial court granted the Motion for Summary Judgment filed by the Oblate defendants. On appeal those defendants argued that they could not be liable under the doctrine of respondeat superior "because the laws of the Roman Catholic Church and the rules of the Oblate Order expressly prohibit priests from engaging in sexual activity, Horton's alleged sexual exploitation of the plaintiff could not be within Horton's scope of employment, nor could it be viewed as a furtherance of the Oblate institutional defendants' business." 46 Conn. App. at 762-63. However, the Appellate Court disagreed, reversed the Motion for Summary Judgment and stated:

> Horton's alleged sexual exploitation of the plaintiff occurred during his church **[*10]** sanctioned pastoral-psychological counseling sessions and while he staffed church retreats. Thus, a trier of fact could reasonably determine that Horton's sexual relationship with the plaintiff was a misguided attempt at pastoral-psychological counseling, or even an unauthorized, unethical, tortious method of pastoral counseling, but not an abandonment of church business.

46 Conn. App. at 765-66.

The facts of this case are readily distinguishable from those of Horton because the plaintiff here was a child of 13, not an adult, and Zizka was not a psychologist. In Horton the priest did not engage in any criminal act. In this case the alleged conduct of Zizka with respect to the minor plaintiff constituted criminal conduct. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 Sec. 53a-71. Sexual assault in the second degree: Class C felony: Nine months not suspendable. (a) A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person; . . .

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*11]

The plaintiff argues that the Diocese may also be vicariously liable under the doctrine of apparent authority. HN6 Under that doctrine a principal may be held liable for an obligation incurred by an agent even if the principal has not expressly authorized the agent to incur the obligation if "the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority . . ." Quint v. O'Connell, 89 Conn. 353, 357, 94 A. 288 (1915).

HN7 " 'Apparent authority must be derived not from the acts of the agent but from the acts of his principal. The acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority.' (Internal quotation marks omitted.) Lettieri v. American Savings Bank, 182 Conn. 1, 8, 437 A.2d 822 (1980); see also Beckenstein v. Potter & Carrier, [*12] Inc., supra, 191 Conn. [120,] 140[, 464 A.2d 6 (1983)]; Fireman's Fund Indemnity Co. v. Longshore Beach & Country Club, Inc., 127 Conn. 493, 497, 18 A.2d 347 (1941); 1 Restatement (Second), supra, 8, pp. 30-32." Hallas v. Boehmke and Dobosz, Inc., 239 Conn. 658, 674, 675, 686 A.2d 491 (1997).

Applying the doctrine of apparent authority in this case, the plaintiff must plead and prove that the Diocese led the plaintiff to a good faith belief that Zizka was authorized by the Diocese to engage in sexual conduct with her. Thus it is not surprising that the Court in Mullen v. Horton, supra, stated that the doctrine of apparent authority had never been applied to establish vicarious liability for tortious conduct and declined to apply it in such a manner. 46 Conn. App. at 772.

For the foregoing reasons, the Motion to Strike the Sixth Count is granted.

The Diocese seeks to strike the Seventh Count and Ninth Count on the grounds that the First Amendment to the United States Constitution forbids this court from intruding into areas of religion. HN8 The Free Exercise Clause of the United State Constitution does not "relieve an individual from obedience to a general law not aimed at the [*13] promotion or restriction of religious beliefs." Minersville School Dist. Bd. of Ed. v. Gobitis, 310 U.S. 586, 594-95, 60 S. Ct. 1010, 1013, 84 L. Ed. 1375 (1940). "The common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not discriminate against [a] religious belief or regulate or prohibit conduct because it is undertaken for religious reasons." Nutt v. Norwich Roman Catholic Diocese, 921 F. Supp. 66, 74 (D. Conn. 1995) (quoting Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). The Court in Nutt stated:

> It is difficult to see how the plaintiff's claims against the defendants would foster excessive entanglement with religion. The common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not discriminate against a religious belief or regulate or prohibit conduct because it is undertaken for religious reasons . . . The court's determination of an action against the defendants based upon their alleged negligent supervision of [a priest] would not prejudice or impose upon any of the religious tenets or practices of [*14] Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of its [employees] to engage in conduct which they, as employers, as well as society in general[,] expressly prohibit. Since the Supreme Court has consistently failed to allow the Free Exercise Clause to relieve [an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs, the defendants [cannot] appropriately implicate the First Amendment as a defense to their alleged negligent conduct.

921 F. Supp. at 74. The Free Exercise Clause might well prohibit this court from interfering in the manner in which the Diocese supervised a priest's performance of Mass, or confession, but it certainly cannot prohibit this court from determining whether the Diocese should be liable for negligently allowing its employees to engage in criminal conduct.

For the foregoing reasons the Motion to Strike the Seventh and Ninth Counts is denied.

The Diocese and the Church have also moved to strike the Eighth Count of the complaint, which purports to state a claim under the Connecticut Unfair Trade Practices Act, 42-110a [*15] et seq. ("CUTPA"). HN9 Section 42-110b(a), states that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Trade or commerce, in turn, is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Connecticut General Statutes 42-110a(4). In determining whether conduct constitutes an unfair trade practice the Courts of this state have adopted the criteria set out in the "cigarette rule" by the federal trade commission for determining when a practice is unfair: " '(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) *whether it causes substantial injury to consumers* [*16] *[(competitors or other businessmen)].*' Conaway v. Prestia, supra, [191 Conn. 484,] 492-93, [464 A.2d 847 (1983)] quoting FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972)." McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984). (Emphasis added.)

The CUTPA claim here is based on the allegation that the defendants engaged in the trade or commerce of providing religion. CUTPA was intended to redress wrongs which occurred in the context of business or commerce. The work of the defendant Church and Diocese did not constitute business or commerce. For the foregoing reason, the Motion to Strike the Eighth Count is granted.

By the court,

Aurigemma, J.

Service: **Get by LEXSEE®**
Citation: **1998 Conn. Super. LEXIS 620**
View: Full
Date/Time: Friday, October 21, 2005 - 10:28 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
[A] - Citing Refs. With Analysis Available
[I] - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **32 Employee Benefits Cas. (BNA) 2458**

↵Select for FOCUS™ or Delivery

☐

*2003 U.S. Dist. LEXIS 23025, \*; 32 Employee Benefits Cas. (BNA) 2458*

MASON TENDERS DISTRICT COUNCIL WELFARE FUND, PENSION FUND, ANNUITY FUND, TRAINING FUND, NEW YORK STATE LABORERS-EMPLOYERS COOPERATION AND EDUCATION TRUST FUND, NEW YORK LABORERS' HEALTH TRUST FUND, NEW YORK LABORERS' HEALTH AND SAFETY TRUST FUND and BUILDING CONTRACTORS ASSOCIATION INDUSTRY ADVANCEMENT PROGRAM, and JOHN J. VIRGA, in his fiduciary capacity as director and ANTHONY SILVERI, as Business Manager of THE MASON TENDERS DISTRICT COUNCIL OF GREATER NEW YORK, Plaintiffs, -against- JNG CONSTRUCTION LTD. and GEORGE KAFANTARIS, Defendants.

00 CV 1032 (GBD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 23025; 32 Employee Benefits Cas. (BNA) 2458

December 17, 2003, Decided
December 19, 2003, Filed

**DISPOSITION:** [\*1] Plaintiffs' motion for summary judgment denied. Defendants' motion for summary judgment granted, and complaint dismissed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, a union, representatives, and various employee benefit trust funds, filed an action against defendants, a construction company and a contract signatory, seeking enforcement of a collective bargaining agreement (CBA). Plaintiffs asserted their action, in part, under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C.S. § 185 et seq. The parties both filed motions for summary judgment.

**OVERVIEW:** The signatory worked for the company as a roofer and was the brother of the company's principal. Union representatives had approached the signatory about employing union members in the company's projects. The signatory alleged that he had agreed to approach the company's principal about the agreement. Without the principal's authorization or approval, the signatory executed a CBA. The court rejected plaintiffs' argument that the signatory had apparent authority to execute the CBA for the company. There was no evidence of any words or deeds attributable to the principal that could have given the impression that the signatory had been given authority to bind the company. Additionally the signatory's words and actions should not have caused the union representative to justifiably believe that the signatory was vested with the requisite authority. Plaintiffs did not point to any action by the principal after the CBA was signed that manifested an intent for the company to abide by the CBA. The court declined to hold the signatory personally liable, because the record as a whole did not demonstrate that the signatory intended to be personally accountable under the agreement.

**OUTCOME:** The court denied plaintiffs' motion for summary judgment. The court granted defendants' motion for summary judgment and dismissed the complaint.

**CORE TERMS:** signatory, collective bargaining agreement, apparent authority, signing, summary judgment, requisite, authority to bind, appearance, signature, secretary, bosses, personal liability, personally liable, duty to inquire, signature line, genuine issue, third party, negotiations, non-movant, purported, agreeing, genuine, telephone conversation, contractual obligation, collective bargaining, authority to sign, personally bound, shop steward, work site, laborer

**LexisNexis(R) Headnotes** ✦ Hide Headnotes