# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GREGORY T. PRENTISS, | : | CIVIL ACTION NO. |
| JOHN RIZZI, RICHARD SEICH, | : | 3:03 CV 00383 (MRK)(LEAD) |
| and DOROTHY BROWN each individually | : | |
| and on behalf of the Wasley Products, Inc. | : | |
| 401(K) Profit Sharing Plan, and the Wasley | : | |
| Products, Inc. Retirement Plan, DIANE | : | |
| CHUDZIK, individually and on behalf | : | |
| of the Precision Molding Company, Inc. | : | |
| 401(k) Profit Sharing Plan, and HOWARD | : | |
| Y. ACHILLE, individually and on behalf | : | |
| of the UAW Pension Plan, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WASLEY PRODUCTS, INC., PRECISION | : | |
| MOLDING COMPANY, INC., | : | |
| ALAN A. WASLEY, ANDREW BRADY, | : | |
| SANDI DUMAS-LAFERRIERE | : | |
| BARRY CONNELL, BARRY L. | : | |
| BULAKITES, JAMES A. WINSLOW, | : | |
| JOSHUA ADAMS CORPORATION, | : | |
| NATIONWIDE LIFE INSURANCE CO., | : | |
| and LINCOLN NATIONAL LIFE | : | |
| INSURANCE CO., | : | |
| | : | |
| Defendants. | : | JUNE 1, 2007 |

**SECOND AMENDED COMPLAINT**

**SUMMARY OF THE ACTION**

The plaintiffs are former or employees of Defendants, Wasley Products, Inc. or Precision

Molding Company, Inc. The plaintiffs are participants in one of the following plans: Wasley

Products, Inc. 401(k) Profit Sharing Plan (formerly the Wasley Products, Inc. Retirement Plan),

Precision Molding Company, Inc. 401(k) Plan, and the Wasley Products, Inc. U.A.W. Local 376

Retirement Plan. They sue their plan sponsors, trustees and third party administrators, for

breaching their fiduciary duties by underfunding the plans, mismanaging the plan investments and allowing money to be diverted from the plans.

## JURISDICTION

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132 (e)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA").

## VENUE

2.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and 29 U.S.C. §1132(e)(2).  The Defendants administered the employee benefit plans at issue in the District of Connecticut and the acts complained of occurred in this District.

## THE PARTIES

### Plaintiffs

3.    Gregory T. Prentiss, at all relevant times, was an employee of defendant Wasley Products, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Wasley Products, Inc. 401 (k) Profit Sharing Plan and the Wasley Products, Inc. Retirement Plan, on whose behalf he also brings this action, within the meaning of 29 U.S.C. §1002(7).

4.    John Rizzi, at all relevant times, was an employee or a retired employee of defendant Wasley Products, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Wasley Products, Inc. 401 (k) Profit Sharing Plan and the Wasley Products, Inc. Retirement Plan, on whose behalf he also brings this action, within the meaning of 29 U.S.C. §1002(7).

5.    Richard Seich, at all relevant times, was an employee of defendant Wasley Products, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Wasley Products, Inc. 401 (k) Profit Sharing Plan and the Wasley Products, Inc. Retirement Plan, on whose behalf he also brings this action, within the meaning of 29 U.S.C. §1002(7).

6.      Dorothy Brown, at all relevant times, was an employee of defendant Wasley Products, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Wasley Products, Inc. 401 (k) Profit Sharing Plan and the Wasley Products, Inc. Retirement Plan, on whose behalf she also brings this action, within the meaning of 29 U.S.C. §1002(7).

7.      Diane Chudzik, at all relevant times, was an employee of defendant Precision Molding Company, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Precision Molding Company, Inc. 401 (k) Profit Sharing Plan, on whose behalf she also brings this action, within the meaning of 29 U.S.C. §1002(7).

8.      Howard Achille, at all relevant times, was an employee of defendant Wasley Products, Inc. within the meaning of 29 U.S.C. §1002(6) and a participant in the Wasley UAW Pension Plan, on whose behalf he also brings this action, within the meaning of 29 U.S.C. §1002(7).

## Defendants

9.      Wasley Products, Inc., at all relevant times, was the plan sponsor and plan administrator of the Wasley Products, Inc. 401 (k) Profit Sharing Plan  the Wasley Products, Inc. Retirement Plan, and the Precision Molding Company, Inc. 401 (k) Profit Sharing Plan and a fiduciary within the meaning of 29 U.S.C. §1002(21)(A).

10.      Precision Molding Company, Inc., at all relevant times, was the plan sponsor and plan administrator of the Precision Molding Company, Inc. 401 (k) Profit Sharing Plan and a fiduciary within the meaning of 29 U.S.C. §1002(21)(A).

11.      Alan A. Wasley, at all relevant times, was the chairman and chief executive officer of the Defendant Wasley Products, Inc., as well as a trustee and a fiduciary of the Wasley

401 (k) Plan, the Precision 401(k) Plan, the UAW Plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A).

12.     Andrew Brady, at all relevant times, was an employee of the Defendant Wasley Products, Inc., as well as a trustee and fiduciary of the Wasley 401 (k) Plan and the UAW Plan within the meaning of 29 U.S.C. §1002(21)(A).

13.     Sandi Dumas-Laferriere, at all relevant times, was an employee of the Defendant Wasley Products, Inc., a trustee of the Wasley 401 (k) Plan, and a fiduciary of that plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A).

14.     Barry Connell, at all relevant times, was an employee of the defendant Wasley Products, Inc., a trustee of the Wasley 401 (k) Plan, and a fiduciary of that plan within the meaning of 29 U.S.C. §1002(21)(A).

15.     Barry L. Bulakites, was, from November 1990 until November 2002, a third party administrator and fiduciary of the Wasley 401 (k) Plan, the Precision 401(k) Plan, the UAW Plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A).

16.     James A. Winslow, was, from November 1990 until November 2002, a third party administrator and fiduciary of the Wasley 401 (k) Plan, the Precision 401(k) Plan, the UAW Plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A).

17.     Joshua Adams Corporation ("JAC"), was, from December 1993 until November 2002, a third party administrator of the Wasley 401 (k) Plan, and a fiduciary of that plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A).

18.     The defendant, Nationwide Life Insurance Company of America is the successor in interest to Provident Mutual Life Insurance Company and is organized and exists under the law of the Commonwealth of Pennsylvania.  Nationwide/Provident Mutual has its principal place

4

of business in Valley Forge, Pennsylvania. Provident Mutual was a fiduciary of the Wasley 401(k) Plan, the Precision 401(k) Plan, the UAW Plan, and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A) from about November 1, 1990 to May 1, 1995.

19.    The defendant, Lincoln National Life Insurance Company, was organized and exists under the laws of the State of Indiana; its principal place of business is in Fort Wayne, Indiana. Lincoln was a fiduciary of the Wasley 401(k) Plan, the Precision 401(k) Plan, the UAW Plan and the Wasley Products, Inc. Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A) from about May 8, 1995 until December 16, 1997.

## FACTUAL ALLEGATIONS

**The following factual allegations are made upon information and belief:**

20.    As of the fall of 1990, Wasley Products sponsored, for the benefit of its non-union employees, a traditional defined benefit pension plan called the Wasley Products, Inc. Retirement Plan.  Defendant Alan Wasley was the sole trustee of the Retirement Plan. The plan was drastically under-funded because the plan administrators had neglected to include all the plan participants when calculating the Plan's liabilities and because Wasley Products failed to place adequate funds in the Retirement Plan trust.   According to a January 25, 1993 memorandum, the Retirement Plan was only half funded on that date.   An examination of opening 401 (k) account balances that were supposed to be derived from the Retirement Plan assets, shows that the Retirement Plan was far less than half funded.

**How Provident Mutual Helped Bulakites and Winslow Steal.**

21.    During September, October and November, 1990, Wasley discussed options for changing Wasley Products' pension programs with two agents of Provident Mutual, the

defendants Barry Bulakites and James Winslow, both insurance agents licensed with the State of Connecticut and authorized to act for Provident Mutual. Bulakites was Agency Manager at Provident Mutual's Agency No.74 in New Haven, Connecticut.

22. The discussions arose after Wasley met Winslow socially through his brother A. J. Wasley, Winslow's sailing companion. In September or October 1990, Winslow introduced Wasley to Bulakites at the Wasley Products facility and they met again there on November 2, 1990. Unknown to Wasley, when they were not trying to win his favor, Bulakites and Winslow were scheming at the Provident Mutual offices in New Haven, Connecticut about how to steal the assets of the Wasley Products Retirement Plan.

23. In a letter on Provident Mutual letterhead dated November 20, 1990 and listing him as "Agency Manager", Bulakites, despite his planned theft of the Wasley Product's pension assets, assured Wasley that he and Provident Mutual could be trusted with honestly and properly running a pension plan, promising that "Provident Mutual can assist you in handling the complex, time consuming and burdensome task associated with the proper administration of a pension plan." Knowing that he and Winslow planned a completely different outcome, Bulakites further falsely promised that he and Provident Mutual "offer the right consulting services to make your plan a success" and that "Our pension team…will provide the expertise needed to keep your plans worry free." To further his scheme with Winslow to steal the Wasley Products pension money, Bulakites proposed that the trust money supporting the plan be transferred to Provident Mutual which, he said, would achieve better investment returns thereby at last achieving full funding. He further proposed that once this was achieved that the Plan be terminated and replaced by a 401(k) defined contribution plan.

24.     Relying on the false promises Provident Mutual made through Bulakites and Winslow of a successful plan, proper plan administration, and worry free operations, by letter dated November 30, 1990 and addressed to Provident Mutual "Attn:  Mr. James A. Winslow", Wasley gave Provident Mutual formal authorization to take over administration of the company's pension plans, including:  (1) set up the 401(k) plan that became known as the Wasley Products, Inc. 401 (k) Profit Sharing Plan effective January 1, 1991; (2) set up the Precision 401(k) Plan; (3)  transfer plan assets of the 401 (k) plans, the Wasley Retirement Plan, and the UAW Plan to Provident Mutual; (4) begin the process of freezing the company's defined benefit plan; (4) calculate annuity payouts for employees currently receiving benefits; (5) begin employee communications, and (6) develop a written timetable to  carry out the transition.

25.     On February 6, 1991 Wasley Products, acting through Wasley, gave Bulakites a limited power of attorney over its defined benefit pension plan.

26.     On February 14, 1991, Wasley Products authorized the transfer of Wasley's pension trust assets to Provident Mutual. A check for the assets payable to "Provident Mutual" was delivered to Bulakites.

27.     On March 8, 1991 Provident Mutual opened an investment account in the name of Wasley Products, Inc. with Winslow named as the account's agent.

28.     In a letter dated March 29, 1991, Richard N. Herb, Provident Mutual's vice president of the Group Pension Division wrote Wasley and welcomed Wasley Products as a Provident Mutual client, thanking him for "choos[ing] us to invest your retirement funds." Intending to build Wasley's trust in Winslow and Bulakites, Herb promised that "Through the continued efforts of James Winslow and Barry Bulakites, we will insure that you receive the distinctive service you should expect from Provident Mutual."  As intended, Herb's letter further

assured Wasley that he could trust Provident Mutual, Winslow and Bulakites with Wasley Products' pension assets.

29.    While the company was reassuring Wasley, it also knew that, through Bulakites and Winslow, it was administering the Wasley Products plans and not merely providing investment services:

   a.    In a letter dated May 23, 1991 on Provident Mutual's New Haven, Connecticut letterhead and delivered to Wasley Products, with a copy to the defendants Bulakites and Sandy Dumas-Laferriere, Provident Mutual employee Cheryl Robin described the company as Wasley Products' "new pension plan administrator";

   b.    In a letter dated February 13, 1992 on Provident Mutual's New Haven, Connecticut letterhead addressed to Lawrence Siegel, Assistant Vice President, Provident Mutual Life Insurance Co. in Philadelphia, Pennsylvania, Bulakites reported on the status of checks issued to pay premiums, including one concerning Wasley employee John Wiblyi.  The letter explains that checks were written the way they were because Provident does "some of the consulting and pension administration" for Wasley.

   c.    In a letter dated November 5, 1992 on Provident Mutual's New Haven, Connecticut letterhead addressed to the IRS, Provident Mutual employee Andrew Gianelli told the IRS that Provident Mutual would soon be filing delinquent Forms 5500 concerning the Wasley Products retirement plans because "the third party administrator that had been filing the Forms for these plans was terminated and we were appointed as the new third party administrator."

d.      In a letter dated February 10, 1993 on Provident Mutual's New Haven, Connecticut letterhead addressed to Dumas-Laferriere, Bulakites enclosed "1991 401(k) 5500 Reports" prepared by Provident Mutual for Wasley's signature. The letter said Wasley should sign the forms and return them to Provident Mutual so the company could file them with the IRS.

e.      In a letter dated April 15, 1994 on Provident Mutual's Wilmington, Delaware letterhead addressed to Sabrina Stanfill at Provident, Winslow answered questions raised about the qualified status of the Wasley retirement plans and noted "This plan has been reviewed by a number of outside actuaries and we believe it to be in compliance.…"

30.     Despite its earlier reassurances, no later than February 13, 1992, Provident knew or should have known that Bulakites presented an unreasonable risk of harm to the company's clients because, on that date and for some time prior, the company had been investigating Bulakites' financial practices at the company's New Haven offices as evidenced by a February 13, 1992 letter from Bulakites to Lawrence Siegel, a Provident Mutual Vice President.  An anonymous letter to the Connecticut Department of Insurance dated May 11, 1994 shows that the February 13, 1992 letter was part of a broader array of allegations against Bulakites that included "theft of premium, forgery of checks, underwriting forgery and securities violation."

31.     Nonetheless, knowing of the allegations against Bulakites and that he was managing Wasley Products' pension monies, Provident continued to employ him until November 3, 1993, did not increase oversight of his activities with regard to the Wasley plans, and did not advise Wasley Products of the allegations or qualify or retract any of the company's previous assurances of "worry free" plan administration.

32.    Instead, during the period between January 1, 1991 and January 1, 1994, Provident sent Wasley statements at least quarterly falsely assuring the company of the good management and safety of its accounts.

33.    Despite these assurances, no later than February 1992, Bulakites and Winslow began stealing money from all of the plans Alan Wasley had entrusted to them.

34.    Ignoring evidence of Bulakites' dishonesty, Provident Mutual did nothing to stop them.

35.    On September 24, 1993, Bulakites forged customer Jacob Feigenbaum's name on one of Feigenbaum's checks so he could falsely call it a first premium payment on the sale of a $2 million life insurance policy. Bulakites' superiors at Provident Mutual learned about this crime no later than October 25, 1993 because on that date Provident Mutual employee Laura Palumbo wrote to "George" at Provident Mutual describing the transaction and near that date Feigenbaum's attorney complained about the matter to Provident Mutual Assistant Vice President and Auditor Lawrence Siegel.

36.    By a letter to Bulakites dated  November 3, 1993 on Provident Mutual letterhead and signed by James M. Craven, Vice-President—Agency, Provident Mutual terminated Bulakites' employment as a Provident Mutual Agent for cause. On November 15, 1993, Provident Mutual filed a Form U-5 with the SEC terminating Bulakites' registration on behalf of PML Securities Company and checking "yes" in a box on the form asking whether "Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct."

37.    On February 4, 1994 Provident Mutual's Regional Manager wrote to Rick Simon at Provident Mutual in Philadelphia about accounts Bulakites had been handling, claiming he had little information about how Bulakites handled accounts he worked on including Wasley Products' because Bulakites "kept the pension office in the dark" and that "Jim [Winslow] felt (and still does feel) a strong allegiance to Barry."

38.    As Winslow noted in a November 7, 1994 letter to James Craven at Provident Mutual, after Bulakites was fired, Winslow, still employed by Provident Mutual and still in charge of the Wasley Products account, left the company's New Haven office and set up shop as Joshua Adams Corporation with Bulakites in Madison, Connecticut. Provident Mutual knew all about it. A December 23, 1993 note from Provident Mutual employee Mark Germain and a December 28, 1993 letter from Thomas J. Ericson of Provident Mutual to Winslow note that Winslow was doing business as "Joshua Adams Consulting". Germain warned, "As I originally anticipated Jim Winslow will be a compliance nightmare". A December 30, 1993 Ericson letter to Winslow, notes that Winslow was working with Bulakites, but does nothing more than admonish him to use proper Provident letterhead.

39.    Even though Bulakites, a man it had discharged for cause and reported to the SEC, was still partners with one of Provident's Career Agents, Provident Mutual failed to do anything to stop it or take other reasonable steps like monitor Winslow more, audit accounts Bulakites was involved with, or notify Wasley Products of Bulakites' termination and the reasons for it.

40.    About this time, Wasley officials including Wasley and the trustee defendants began seeing documents from Bulakites and Winslow in the name of JAC but did not ask questions about the reason for the change and thus reveal that Bulakites had been fired, was

under investigation for several acts of fraud, and was no longer backed by a financially responsible entity.

41.     Meanwhile, Provident Mutual went beyond merely looking the other way, and took active steps to cover up Bulakites' fraud.  When an anonymous person wrote a letter of complaint received by the State of Connecticut Insurance Department on May 11, 1994 accusing Bulakites of "theft of premium, forgery of checks, underwriting forgery and securities violation" Provident Mutual tried to conceal and minimize its evidence of Bulakites' dishonesty.

42.     Without adequately investigating the allegations contained in the anonymous letter, on June 10, 1994, Provident Mutual Asst. Vice President and Auditor Lawrence Siegel wrote Daniel F. Harrigan of the State of Connecticut Insurance Department, asserting that the anonymous writer "does not have all the facts, and makes a number of erroneous statements." Siegel misled Harrigan by suggesting the violation was the use of an agency check to pay a first premium even though Siegel knew that the check was Feigenbaum's check, that Feigenbaum's name had been forged on it and that Feigenbaum had already supplied the forged check to the National Association of Insurance Dealers on June 8, 1994.  Siegel told Harrigan that Provident "is not aware of any 401K money disappearing" and refused to investigate the matter unless it was "provided with additional information."  Siegel withheld from Harrigan the other evidence Provident Mutual had of Bulakites' dishonesty.

43.     Despite being aware of specific theft allegations against Bulakites, Provident Mutual still failed to increase its monitoring of Winslow, audit accounts Bulakites was involved with or notify Wasley Products of Bulakites' termination and the reasons for it.

44.     Instead of uncovering Winslow's participation in fraud, Provident Mutual terminated Winslow as an in-house "Career Agent" on December 31, 1994 citing "lack of

production"; it granted him a "Special Agent's Agreement" but terminated it effective April 30, 1995, again for lack of production.

45.    Because Provident Mutual did not investigate Bulakites and Winslow, because it actively covered up their wrongdoing, and because it did not tell Wasley Products of their misconduct and potential for misconduct, Provident Mutual was a proximate cause of all of the plans' losses. Provident Mutual's acts and omissions allowed Bulakites and Winslow to continue stealing and left their prior peculations uncovered until after the chances of recovering the stolen assets from Bulakites, Winslow, and the Wasley defendants had significantly diminished because of their declining financial positions.

**How Lincoln Helped Bulakites and Winslow Steal.**

46.    Despite his nefarious past, in 1995, Bulakites landed a high-profile job with another company all too willing to look the other way.  On May 8, 1995, defendant Lincoln hired Bulakites and named him its "Regional CEO".  In an "Employment Record" document he signed May 9, 1995, Bulakites told Lincoln he was fired from Provident because of a "conflict with senior management." Lincoln never bothered to check with Provident on what the "conflict" was about and whether his firing was justified. It hired Bulakites despite learning that his home had recently been foreclosed and that Massachusetts Mutual, a former employer, had recently sued Bulakites in federal court.

47.    Lincoln listed Bulakites among its employees, creating for him an "Employee Profile" and providing for him employee benefits including disability, health, dental, and life insurance.

48.    On June 1, 1995, Lincoln hired Winslow as an employee Brokerage Manager and an agent, performing a similarly shoddy investigation of his background and credentials, digging

no deeper and hiring him despite serious documented credit problems, knowledge of his arrest in a drug conspiracy, his conviction for drug delivery, and despite knowing that he filed an application for a Connecticut insurance license that was criminally misleading because it falsely stated that he had never been convicted of a crime.

49.    In a May 8, 1995 letter, Bulakites wrote to Wasley Products, announcing the "association of Joshua Adams Corporation with Lincoln National Corporation."

50.    In about July 1995, Bulakites and Winslow, acting in their new capacities on behalf of Lincoln, lied to Wasley Products telling company officials that it was in Wasley Products' financial interest to transfer pension assets from Provident to Lincoln. Bulakites and Winslow actually planned the move to help them steal more of the plan participants' pension money.

51.    Once Wasley Products agreed, Bulakites and Winslow told the company to wire the money into an account at the New Haven Savings Bank. Wasley Products then wired $100,000 of pension assets to a payee called "Wasley Pension Acct" without bothering to find out who controlled the account that became one of Bulakites and Winslow's chief means of pilfering the plaintiffs' pensions.

52.    Meanwhile Lincoln helped the pair by giving Wasley false assurances about the reliability of Bulakites and Winslow, extolling their competence and reliability in August 1995 promotional materials and in regular (at least quarterly) statements thereafter.

53.    All the while, Bulakites and Winslow kept stealing money from the plans.

54.    Not that they could not have been stopped. Lincoln accidentally learned of Provident Mutual's securities complaint against Bulakites in October 1995. Around the same time, according to Lincoln internal documents from April 1996, the company found that he had

failed to cooperate with an internal review, improperly used petty cash, improperly wrote checks, and improperly used the company telemarketing account. On February 17, 1996, Bulakites flunked a NYSE General Securities Representative Examination. On April 18, 1996, less than a year after granting him the grandiose title "Regional CEO", Lincoln forced Bulakites to resign.

55.    Although it had good reason to believe that Bulakites was dishonest, Lincoln did not investigate Bulakites' activities, further dishonest acts, did not report Bulakites to the SEC, and did not tell clients like Wasley Products about him; instead the company continued to send Wasley Products misleading and incomplete communications, at least quarterly, reassuringly reporting on their accounts and failing to mention anything negative about Bulakites.

56.    Worse still, Lincoln made sure Bulakites' rip off of the Wasley Products 401(k) Plan would stay secret and continue, by paying him $37,500 to leave Lincoln quietly and agreeing with Bulakites in writing on May 20, 1996 that it would not make "disparaging or uncomplimentary statements" about him. Bulakites obliged Lincoln by promising to do the same in return, and presciently promising to "cooperate, aid, testify, etc. regarding any and all current and future legal actions brought for or against Lincoln…."

57.    Although it knew Bulakites and Winslow were business partners and closely associated concerning the Wasley Products account, Lincoln did not investigate, question or more closely supervise Winslow, but, instead left him on the company payroll until December 17, 1997.

58.    Because Lincoln did not investigate Bulakites and Winslow, because it actively covered up their wrongdoing, and because it did not tell Wasley Products of their misconduct and potential for misconduct, Lincoln was a proximate cause of all of the plans' losses. Lincoln's acts and omissions allowed Bulakites and Winslow to continue stealing and left their prior

15

peculations uncovered until after the chances of recovering the stolen assets from Bulakites, Winslow, and the Wasley defendants had significantly diminished because of their declining financial positions.

59.     During the approximately twelve-year period when they administered the plans, Bulakites and Winslow repeatedly defrauded them by stealing their assets and lying about their activities to keep them concealed. Part of their fraud was periodically (at least quarterly) making false written statements to Wasley Products about the state of plan investments. Bulakites and Winslow made the false statements to Wasley Products, Inc., to Dumas-Laferriere, and to Wasley at Wasley Products' offices in Plainville, Connecticut beginning in 1991 and again each year until about November 30, 2002 when Wasley Products fired them.  The Special Master in this case reports that $715,332.44 intended for the plans is missing without explanation.

**The Defendants are Responsible for the Money the Plans Lost.**

60.     Wasley and Wasley Products are liable for Bulakites and Winslow's fraud. Wasley and Wasley Products delegated the plans' administrative duties to Bulakites and Winslow without examining their qualifications using the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  Things Wasley and Wasley Products should have investigated include but are not limited to Bulakites and Winslow's integrity, employment status, track record, professional affiliations, education, work history, insurance, the history of complaints against them, and securities registrations.

61.     Wasley, Wasley Products, Dumas-Lafferiere, Brady and Connell are also liable for Bulakites and Winslow's fraud because they did not monitor the two contractors' activities

with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters. Things these defendants should have done include, but are not limited to, arranging for third party audits of the plans, monitoring Bulakites and Winslow's employment status, confirming that the two were properly insured or were affiliated with someone who was, and tracking any complaints against either of them.

62.    Wasley, Wasley Products, Dumas-Lafferiere, Brady and Connell (the "Wasley defendants") also violated ERISA §302 and breached their fiduciary duties by failing to fully fund the UAW Plan, the Wasley 401(k) Plan and the Precision 401(k) Plan, and by diverting participant contributions to the 401(k) plans for use by Wasley Products, and by conspiring with Bulakites and Winslow to conceal this breach by sending quarterly statements to plan participants misrepresenting the balances in their 401(k) accounts and by falsely telling plan participants that the 401(k) plan was financially sound and well managed at annual updates about the plan typically held in January of each year from the Plan's inception through March 2003. The plaintiffs relied on these misrepresentations and consequently continued to have their 401(k) benefits diverted by Wasley Products and plundered by Bulakites and Winslow.

63.    Provident Mutual and Lincoln are liable for Bulakites and Winslow's misconduct because the two companies acted as fiduciaries of the plans – they controlled the two 401(k) Plan's assets, advised the UAW and the Wasley Retirement Plan about investments for a fee, and made discretionary decisions about plan administration – but failed to do so with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims. Their failings are detailed in the previous sections of this complaint.

64.     Provident Mutual and Lincoln are also liable for Bulakites and Winslow's misconduct under the doctrine of respondeat superior because when they engaged in their misconduct, Bulakites and Winslow were Provident or Lincoln's agents acting within the scope of their employment.

**The Plaintiffs First Learned of the Fraud in 2003.**

65.     With the exception of the conduct covered by Count II, plaintiffs acquired actual knowledge of the breaches of duty alleged against Wasley Products, Wasley, Bulakites, Winslow and JAC in this complaint, at the earliest, after March 4, 2003 when Wasley Products sued Bulakites, et al and March 21, 2003 when plaintiffs were told about the suit in a memorandum from Wasley.

66.     Plaintiffs discovered the conduct covered by Count II in about August of 2005 when plaintiff Rizzi compared his opening 401(k) Plan account balance with the annual annuity Wasley Products owes to a 1987 Retirement Plan retiree, John Wiblyi.  When Rizzi discovered how small his opening balance was when compared with Wiblyi's annuity, he came to believe for the first time that the company short changed employees when it converted the Retirement Plan benefits to 401(k) opening balances.

67.     On June 24, 2003 and June 26, 2003, Attorney Thomas G. Moukawsher wrote a letter to Thomas W. Witherington and Mary E.R. Bartholic of the law firm of Cohn Birnbaum & Shea P.C., 100 Pearl Street, attorneys for Wasley Products, Inc., the 401(k) Plan administrator. Moukawsher claimed that Wasley had breached fiduciary duties it owed to plaintiffs Prentiss,

Rizzi, Seich, and Brown and demanded relief.    Plaintiffs sued when, after 90 days, Wasley Products had failed to act in response to the demand.

68.    Plaintiffs acquired actual knowledge of the agency relationship between Bulakites and Winslow and Provident Mutual and Lincoln in 2005 when, through counsel, they saw a letter produced in discovery from Barry Bulakites to Provident Mutual Assistant Vice President Lawrence Siegel dated February 12, 1992, saying that Bulakites and Winslow, through Provident Mutual, was doing plan administration work for Wasley and later when they saw other discovery documents showing that Lincoln took over this work in 1995.  Plaintiffs, through counsel, was aware that Wasley Products had previously alleged this agency relationship existed but were not convinced that the relationship existed based upon the bare allegation made especially in light of Wasley Products' pecuniary interest in making the allegation.

**Rule 23.1 Statement Denying Collusion and Explaining Lack of Demand.**

69.    Plaintiffs bring this action of their own accord; it is not a collusive action to confer jurisdiction on the Court where it otherwise wouldn't have it.  They have not demanded voluntary remedies from the defendants before filing a Second Amended Complaint because it would be futile and redundant in light of extensive other settlement negotiations between the parties.

**COUNT I: Mismanagement of Plan Assets.**

70.    Through the acts and omissions described in this complaint, defendants failed to discharge their fiduciary duties with respect to the plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants of the plans and their beneficiaries and defraying reasonable expenses of administering the plans in violation of ERISA §404 and §405(a)(2).

71.     Through the acts and omissions described in this complaint, defendants failed to discharge their fiduciary duties with respect to the plans with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404 and §405 (a)(2).

72.     Through the acts and omissions described in this complaint, defendants caused the plans to engage in a transaction or transactions which they knew or should have known constituted direct or indirect transfers of assets of the plans to, or the use of assets of the plans by, or for the benefit of, a party in interest in violation of ERISA §406 (a) (1) (D).

73.     Through the acts and omissions described in this complaint, Bulakites, Winslow, JAC, Provident Mutual and Lincoln dealt with assets of the plans in their own interest or for their own account, in violation of ERISA § 406 (b)(1).

74.     Through the acts and omissions described in this complaint, defendants failed to ensure diversification of the investments of the 401 (k) plans so as to minimize the risk of large losses and therefore violated ERISA § 404 (a) (1) (C).

75.     Through the acts and omissions described in this complaint, defendants failed to act in accordance with the documents and instruments governing the plans insofar as such documents and instruments are consistent with the provisions of law, in violation of ERISA §404 (a) (1) (D).

76.     Through the acts and omissions described in this complaint, defendants acted in transactions involving the 401 (k) plans on behalf of a party whose interests are adverse to the interests of the Plan and/or the interests of the Plan participants and beneficiaries, in violation of ERISA §406 (b) (2).

77.    Defendants' breaches of fiduciary duty have caused the plans great financial loss and defendants are liable pursuant to ERISA §502 (a)(2) for appropriate civil relief under ERISA §409, or, in the alternative, for relief under ERISA §502(a)(1)(B) or ERISA §502(a)(3).

**COUNT II: Defined Benefit Pension Plan.**

78.    During the times relevant to this count, defendants Wasley Products, Alan Wasley, Sandi Dumas-Laferriere, Barry Bulakites, James Winslow, and Provident Mutual were fiduciaries with respect to the Retirement Plan within the meaning of 29 U.S.C. §1002(21)(A) because they exercised discretion and control over its administration or managed its investments for a fee.

79.    In 1991 Wasley Products, with the advice and assistance of Provident Mutual's agents or employees Bulakites and Winslow, froze (without terminating) the Retirement Plan and told the Plaintiffs that it had converted their accrued benefits into lump sums and deposited them into the Wasley or the Precision 401(k) Plan.

80.    One or more of the defendants or their agents negligently or deliberately understated the plaintiffs' accrued benefits when converting them to lump sums and depositing them into the 401(k) plans.  Because of this breach of fiduciary duty, the plaintiffs lost vested accrued benefits.

81.    Defendants' breaches of fiduciary duty described above have caused plaintiffs a loss of benefits and defendants are liable to the Retirement Plan or the 401(k) plans for the return of these losses under ERISA §502(a)(2) or they are liable to pay benefits under ERISA §502(a)(1)(B)  or they are subject to appropriate equitable relief under ERISA §502(a)(3).

82.    Provident Mutual and Lincoln are liable to the Retirement Plan or the 401(k) plans for the misconduct of Bulakites and Winslow because, upon information and belief,

Bulakites and Winslow were employees of Provident Mutual when they helped Wasley Products freeze the Retirement Plan and employees of Provident Mutual or Lincoln when they administered the 401(k) plans knowing that the plaintiffs' accounts were understated without telling the plaintiffs,  the plan sponsor, or the trustees and without taking any other action to ensure the return of the plaintiffs' lost benefits.  In addition to their agency liability as outlined in this complaint, Provident Mutual and Lincoln are also liable for the underfunding because they were fiduciaries of the 401(k) plans and aided Bulakites and Winslow in concealing their fraudulent schemes which if exposed would also have exposed the underfunding of the 401(k) at a time when the plans had a greater likelihood of forcing Wasley Products to fully fund the plans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs in their individual and representative capacities, pray for relief as follows:

1.    Damages and/or the restoration of losses to the plans under ERISA §502 (a)(2) and ERISA §409 (a).

2.    Benefits due under the terms of the plans under ERISA §502(a)(1)(B).

3.    Under ERISA §502 (a)(3), an equitable accounting administered by a court appointed special master at defendants' expense to determine the amount of each plan participants' losses caused by the defendants' breaches.

4.    A constructive trust over and disgorgement of all funds and profits Bulakites, Winslow, JAC, Provident Mutual and Lincoln have received as a consequence of their dealings with the plans under ERISA §502 (a)(3).

5.    Appointment of independent trustees for the plans.

6.        Other appropriate relief pursuant to ERISA §502 (a)(1)(B), ERISA §502 (a)(3) or

ERISA §502 (a)(2).

7.        Interest.

8.        Attorney's fees pursuant to ERISA §502 (g)(1).

9.        Costs.

10.     Such other and further relief as the Court may deem just.




THE PLAINTIFFS


BY /s/ Thomas G. Moukawsher
Thomas G. Moukawsher ct08940
Ian O. Smith ct24135
Moukawsher & Walsh, LLC
21 Oak Street, Suite 209
Hartford, CT 06106
T: (860) 278-7000
F: (860) 548-1740
tmoukawsher@mwlawgroup.com
ismith@mwlawgroup.com

THEIR ATTORNEYS

## CERTIFICATE OF SERVICE

I certify that on June 1, 2007 a copy of this second amended complaint was filed electronically. Notice will be sent by e-mail to all parties by the Court's electronic filing system. Parties may access this through the Court's system.

Theodore J. Tucci
Jean Elizabeth Tomasco,
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103

Joseph V. Meaney, Jr.
Cranmore, Fitzgerald & Meaney
49 Wethersfield Ave.
Hartford, CT. 06114

Marissa A. Bellair
Steven Errante
Eric P. Smith
Nancy Fitzpatrick Myers
Lynch, Traub, Keefe, and Errante, LLP
52 Trumbull Street
P.O. Box 1612
New Haven, CT. 06506

Sara Simeonidis
Deborah S. Freeman,
Bryan D. Short
Bringham McCutchen
1 State Street
Hartford, CT 06103

James J. Reardon, Jr.
Thomas G. Rohback
LeBoeuf, Lamb, Greene & MacRae
225 Asylum St.
Hartford, CT 06103

  /s/ Thomas G. Moukawsher
Thomas G. Moukawsher ct08940
Moukawsher & Walsh, LLC
21 Oak Street, Suite 209
Hartford, CT 06106
T: (860) 278-7000
F: (860) 548-1740
tmoukawsher@mwlawgroup.com